**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAMELA LYNCH,

                      Plaintiff,

    v.

RIDGWAY AREA SCHOOL DISTRICT,

                      Defendant.

Civil Action No. 1:15-cv-00218 (BJR)

MEMORANDUM OPINION
DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT.

## I.    INTRODUCTION

Currently before the Court is Defendant's Motion for Summary Judgment (Doc. No. 60). Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will GRANT Defendant's Motion. The Court's reasoning follows.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Pamela Lynch, born March 25, 1957, was hired by Defendant Ridgway Area School District as an elementary teacher in 1988 and terminated on July 9, 2013 after at least two years of documented infractions. (*See* Doc. No. 62 ¶¶ 1-5.) In a February 25, 2011 reprimand letter, then-Superintendent Dr. Thomas Butler noted that Lynch's behavior demonstrated that she did not "fully understand the importance of professional behavior in the school system." (*Id.* ¶ 15.) He explained, "Throughout this school year, there have been numerous overwhelming requests from members of the current third grade team to address your lack of teamwork and 'bullying' behaviors." (*Id.* ¶ 16.)

On May 26, 2011, Lynch was placed on a Performance Improvement Plan ("PIP"). (*Id.* ¶ 14.) Among other things, the PIP required Lynch to: (1) maintain "calm and appropriate

1

behavior when communicating within the school environment with teachers, staff and students"; (2) "[s]tay in assigned area during instructional times"; and (3) "not leave a classroom of students alone at any time." (*Id.* ¶ 20.) The PIP further made it clear that failure by Lynch to meet the expectations set forth in the PIP would result in an unsatisfactory performance rating, and that two unsatisfactory performance ratings would result in the commencement of termination proceedings. (*Id.* ¶ 21.)

Lynch received an unsatisfactory performance review at the end of the 2011-2012 School Year. (*Id.* ¶ 22.) The 2011-2012 end of year evaluation listed Lynch's performance unsatisfactory in, among other areas, "Professional Responsibilities" and more specifically, in "maintaining accurate records," "communicating with families," "participating in a professional community," "growing and developing professionally," and "demonstrating professionalism." (*Id.* ¶ 23.) The 2011-2012 end of year evaluation summarized Lynch's job performance deficiencies in relevant part as follows:

> This Structured Evaluation Summative form is a result of events which took place during the final weeks of the school year (2011-2012). Mrs. Lynch had a student that was not completing assignments (30+ total as per Mrs. Lynch). A request was made for Mrs. Lynch to give Mrs. Herzing a copy and/or a description of the missing assignments. Twelve papers where handed in and a note stating "Homework notebook (check) for each time not signed -- sometimes I gave him a break if he missed the end of the day instructions." A request was made again to give a copy and/or description of assignments and nothing was handed in. Assignments that were handed in could be traced back to February 2nd lesson plans.
>
> Mrs. Lynch abandoned her assigned duties to have a "Cheer Explosion" meeting with interested students. This meeting took academic time away from her assigned students as well as those students who left other classrooms to attend this meeting. This was an unauthorized meeting during school hours, which disrupted the educational environment. There have been other times when her classroom has been left unattended.
>
> Mrs. Lynch refused, at least initially, to divulge important information, to both the school counselor and principal, pertaining to the safety of students, as mandated by law.

> An incident that occurred in her classroom was shared with other staff members, her class as a whole, and during a staff meeting. Mrs. Lynch did not follow the confidentiality policy of the school district or the guidelines intended by FERPA. Two students admitted to participating in dangerous acts within the classroom setting. When this was brought to Mrs. Lynch's attention she stated that it did not happen. When further questions were asked of Mrs. Lynch, she stated that it is not her responsibility to watch the students or what they do inside their desk.
>
> Mrs. Lynch has failed to demonstrate her knowledge and understanding of confidentiality and professional responsibilities.
>
> Mrs. Lynch was found using her private cell phone during instructional time.

(*Id.* ¶ 24.) Then-Superintendent Dr. Michael O'Brien documented similar issues to Lynch in a letter dated June 26, 2012. (*Id.* ¶ 25.)

Lynch filed a grievance to the 2011-2012 unsatisfactory rating. (*Id.* ¶ 26.) After holding a hearing in which Lynch was represented by counsel, and afforded the opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence in support of her position, the arbitrator found that Defendant had met its burden by a preponderance of the evidence that there was just cause for the unsatisfactory rating. (*Id.* ¶¶ 28-29.) In denying the grievance, the arbitrator held in relevant part:

> There were certain events in May 2012 which individually, and cumulatively, correctly caused the District to decide that an unsatisfactory rating was required to get Ms. Lynch's attention. One of the most troublesome events was Ms. Lynch's refusal to immediately tell Guidance Counselor Daghir and Principal Herzing the name of the young girl who told Ms. Lynch that G.V "hated his life." As G.V. had been in possession of a razor blade, it was imperative that the District be able to promptly and thoroughly investigate whether G.V. meant to harm himself or others. In Ms. Daghir's words: "I wouldn't want to send a student home with an intention to hurt himself or someone else *even* if it were a vague statement. I would want to meet with him. I would want to talk with his parents and make them aware of the fact, you know, he had made a statement to hurt himself or someone else."
>
> The outright refusal of Ms. Lynch, as a mandated reporter, to tell Ms. Daghir the name of the girl, and the fact that she only relayed the information to Principal Herzing because she might otherwise get in trouble, is disturbing and unacceptable. Ms. Lynch's responsibility was to report without delay all the particulars of the

razor blade incident, including the young girl's name, to the appropriate District officials, who were Ms. Daghir and Principal Herzing. It was not Ms. Lynch's province to decide by herself and on her own that G.V. really didn't intend to hurt himself. Rather, Ms. Lynch was mandated to report. Further, if she was worried that G.V. might retaliate against the young girl, she could have mentioned this to Ms. Daghir and Principal Herzing, so they could follow up to protect the girl's safety.

It is also troubling that Ms. Lynch openly spoke of the razor blade incident to Ms. Raubenstrauch on the bus within the earshot of students. Very succinctly and properly, Ms. Raubenstrauch told her to "shut up," so she would not divulge confidential information to the students. Ms. Lynch's making G.V.'s business known to all within hearing range was a fundamental breach of confidentiality. In particular, and most especially, a troubled boy such as G.V. is entitled to have his privacy respected. Further, he has the right to expect that a responsible adult to whom he has been entrusted *in loco parentis* for care and custody will not make his business public, especially to his peers.

It is further troubling that Ms. Lynch evidently spoke to her class about the G.V. razor blade incident, and then she wanted Ms. Daghir to breach confidentiality and speak to the class about it. According to Ms. Daghir's credible testimony, Ms. Lynch made her students aware of the razor blade incident with G.V. and she told the students that they would not have any fun for the rest of the year because of the incident. In Ms. Lynch's own words, she told the class "We're not going to be able to have freedoms, and it's not going to be fun until you earn it back." This is neither acceptable nor appropriate behavior for a professional employee.

There are also certain minimum standards of professional dealings or communications between teachers, their administrators, and the community that may reasonably be expected. Ms. Lynch's interaction with Assistant to the Superintendent for Special Education Scull and parent Amato did not meet this standard. While Ms. Lynch may not have had the cell phone, it would be reasonably expected that she would stop, briefly and courteously explain to Ms. Scull and Mr. Amato that Mr. Kuleck had the phone, and then go on her way. As it was, her demeanor and attitude was rude and disparaging. Of itself, this one incident would not be enough for a unsatisfactory rating, but cumulatively with Ms. Lynch's other deficiencies, it is indicative of a lack of professionalism; it does not foster community respect and goodwill; and it is not an appropriate interaction with a member of the administrative staff.

Other incidents which cumulatively lend support to an unsatisfactory rating are Ms. Lynch's allowing G.V. to fall 38 assignments behind; her requesting that Ms. Parrish announce during instructional time that there would be a sign-up for Cheer Explosion, which is not a school sponsored activity; and leaving her class in the care of Ms. Paoletta to conduct an unapproved meeting so she could sign the students up for Cheer Explosion.

4

> ***
> Based on all the foregoing, I respectfully state that the district has proven by a preponderance of the evidence that it properly issued a first unsatisfactory rating to Mrs. Lynch for the latter portion of the 2011-2012 school year. The grievance will therefore be denied.

(*Id.* ¶ 30.)

On June 12, 2012, Lynch was placed on another PIP for the 2012-2013 school year. (*Id.* ¶ 31.) This PIP required Lynch to improve her classroom supervision by "actively supervis[ing] her classroom, at all times;" "not dismiss[ing] herself from assigned duties;" and "actively monitor[ing] students assigned to her at all times," and to improve her professionalism by "comply[ing] with school and district regulations and time lines;" "not engag[ing] in practices that are self-serving or harmful to students;" "refrain[ing] from engaging in conversations (phone, cell phone, or face-to-face) that are not directly related to instruction during her assigned instructional time;" "refrain[ing] from divulging private information about students to non-authorized adults or students;" "refrain[ing] from making global statement about students and staff, which have a negative connotation or are potentially slanderous or in violation of FERPA." (*Id.* ¶ 32-33.) The PIP further indicated that failure to comply with the PIP could result in termination. (*Id.* ¶ 34.)

On June 11, 2013, Lynch received another unsatisfactory rating for the 2012-2013 school year. (*Id.* ¶ 36.) This evaluation included documentation that:

- Lynch's students were observed running in the classroom, were "placed in the hall unsupervised" and "allowed to use personal electronic devices for the purpose of taking photos and videos of themselves and others;"

- On September 26, 2012 a student in Lynch's classroom answered the phone and informed the principal that Lynch was in the hall and did not want to talk;

- On November 1, a special education teacher complained to the administration that Lynch had ignored three requests for special education paperwork;

- On November 8, 2012, Lynch was informed by a grandparent that her grandchild was being inappropriately touched in her class. Lynch did not report this to the Administration;

- On November 12, 2012, Lynch failed to show up for an IEP meeting;

- On November 15, 2012, Lynch's students were observed unsupervised in the hall and causing a disturbance while Lynch was in the class room oblivious to the situation;

- On December 13, 2012 a group of Lynch's students were in the hall unsupervised for an extended period of time;

- On January 3, 2013 Lynch was observed making unprofessional comments in front of her students;

- On January 9, 2013 the Director of Technology reported that Lynch was inappropriate and unprofessional in front of her students when he was fixing a computer in the classroom;

- On January 25, 2013, Dr. O'Brien held a meeting with Lynch in which the ongoing concerns with her performance were discussed including: (1) sending school related emails with confidential and protected information to an unauthorized business address; (2) using instructional time to send personal emails; (3) not submitting grades; (4) making unprofessional comments to other employees; (5) failing to supervise students; and (6) failing to submit IEP information.

(*Id.* ¶ 37.)

These incidents were documented throughout the 2012-2013 school year in notes maintained by the principle and superintendent. (*Id.* ¶¶ 38, 40.) Lynch also received several letters of reprimand during the 2012-2013 school year. (*Id.* ¶ 41.) After the June 11, 2013 unsatisfactory rating, Lynch was suspended without pay and the District began termination proceedings and recommended charges to the Board. (*Id.* 42.) After Lynch waived her right to a hearing, the Board terminated Lynch's employment with the District on July 9, 2013. (*Id.* ¶¶ 43-44.) For purposes of this motion, the District admits that Lynch was replaced by a woman who was significantly younger than Lynch. (ECF 68 ¶ 10.)

Lynch's operative First Amended Complaint, filed October 28, 2015, brings claims for age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA") and parallel claims under the Pennsylvania Human Relations Act ("PHRA"). Defendant's Motion for Summary Judgment (Doc. No. 60) is now ripe.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether to grant summary judgment, a trial court must resolve all doubts against the moving party and examine the record in a light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654 (1962). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on "unsupported assertions, conclusory allegations, or mere suspicions." *Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *Williams v. Borough of West Chester*, 801 F. 2d 458, 460 (3d Cir. 1989).

## IV. DISCUSSION

"There is no need to differentiate between [Plaintiff's] ADEA and PHRA claims because, for our purposes, the same analysis is used for both." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 972 (3d Cir. 1998). The Court will address Plaintiff's retaliation and discrimination claims in turn.

7

**A. Retaliation**

To establish a claim for retaliation, a plaintiff must show that: (1) she engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *See Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 508-09 (3d Cir. 2004). There is no dispute that the termination of Plaintiff's employment constitutes an adverse action, satisfying the second element.

Plaintiff identifies two potential protected activities she engaged in. First, she notes that she filed grievances regarding her treatment on May 17, 2011 and May 29, 2012. Defendant does not dispute that employment grievances are protected activity. "To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015). "In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.* There is no temporal proximity between the filing of these grievances in 2011 and 2012 and Plaintiff's termination over 12 months later on June 13, 2013. *See, e.g.*, *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Nor has Plaintiff identified any inconsistencies in the reasons Defendant has provided for her termination or other evidence of retaliatory animus. Plaintiff's Amended Complaint alleges that "during a union meeting where union staff were present, the Superintendent became extremely irritated that Plaintiff had filed an administrative complaint. He indicated he would be filing another unsatisfactory rating for her at the end of the school year, at the beginning of the 2013-2014 school year and that he would be firing Plaintiff." (Doc. No. 15 ¶ 32.) If true, this allegation would suffice to advance Plaintiff's retaliation claim. However, Plaintiff can point to no record evidence to support this allegation.

The second protected activity Plaintiff identifies that she engaged in was rejecting a settlement proposal from Defendant concerning her allegations of discrimination one day before she was suspended without pay. However, Plaintiff has not produced any evidence of a settlement offer made prior to her termination. More importantly, Plaintiff has supplied no citation for her contention that declining a settlement offer is protected activity under the ADEA. The anti-retaliation provision of the ADEA provides that an employer may not discriminate against an employee for opposing an unlawful practice or for participating in an ADEA proceeding. 29 U.S.C. § 623(d). Failing to reach a settlement agreement does not amount to opposing an unlawful practice or participating in an ADEA proceeding. "Applicable jurisprudence has consistently emphasized that "[t]he mere offer of the severance agreement is insufficient to constitute discrimination in the retaliation context." *Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 323 (E.D. Pa. 2014) (quoting *E.E.O.C. v. Nucletron Corp.,* 563 F. Supp. 2d 592, 598 (D. Md. 2008)). Thus, even if Plaintiff could produce evidence that she rejected a severance package prior to her termination, that action would not represent protected activity and could not provide the basis of a retaliation claim.

## B. Discrimination

In the absence of direct evidence of discrimination in an ADEA claim, the Court employs the burden shifting analysis provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to *McDonnell Douglas*, once an employee establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual. *Id.* Throughout this burden-shifting analysis, the burden of persuasion remains on the employee. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995).

To prove a prima facie case of age discrimination under the ADEA, Plaintiff must prove four elements: (1) that she is forty years old or older; (2) that she is qualified for her position; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances which raise an inference of unlawful age discrimination. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009). The inference of unlawful age discrimination is "usually established through an employer's hiring of a sufficiently younger replacement." *Edgerton v. Wilkes-Barre Home Care Serv., LLC*, 600 F. App'x 856, 858 (3d Cir. 2015) (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004); *Torre v. Casio, Inc.*, 42 F.3d 825, 830–31 (3d Cir. 1994)).

Plaintiff has advanced a prima facie case of these four elements. She was 56 years old when she was terminated; she has produced reference letters from former principles attesting to her qualifications as a teacher; her termination was the quintessential adverse employment action; and she was replaced by a teacher in her twenties.

This prima facie case is sufficient to shift the burden of production to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant has satisfied that burden by documenting a record of performance issues in unsatisfactory evaluations, disciplinary letters, and performance improvement plans. Thus, any presumption of discrimination drops from the case and Plaintiff has the burden to adduce evidence from which a factfinder would reasonably disbelieve the employer's articulated reasons for the action and find that it was pretextual. *McDonnell Douglas*, 411 U.S. at 804. "The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006) (quotations and citations omitted; alteration adopted). Thus, once a plaintiff has made out a prima facie case, she must rebut Defendant's alleged reason for her termination by demonstrating sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to rebut that claimed reason." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Plaintiff has sought to refute some of the claims made against her by Defendant, which she argues is sufficient at least to create a dispute of material fact to defeat summary judgment. However, a closer analysis of the record reveals that Plaintiff has failed to challenge the core basis of her termination. "Pretext is not demonstrated by showing simply that the employer was mistaken." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). An "employee's assertions of [her] own good performance [are] insufficient to prevent summary judgment where the employer produced performance reviews and other documentary evidence of misconduct and insubordination that demonstrated poor performance." *Id.* Further, "a plaintiff cannot rely on

11

unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment." *Solomon v. Soc'y of Auto. Eng'rs.*, 41 F. App'x 585, 586 (3d Cir. 2002). In *Billet v. CIGNA Corp.*, 940 F.2d 812 (3d Cir. 1991), *overruled in part on other grounds, St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993), the Court found that an employee failed to create a jury question on the issue of whether his employer's articulated reasons for his termination were pretextual because the employee "primarily disagreed with the objective evidence against him, *e.g.*, his evaluation, misconduct probation, and relationship with underwriting, and argued that his performance was adequate." 940 F.2d at 825. "However, his view of his performance is not at issue; what matters is the perception of the decision maker. The fact that an employee disagrees with an employer's evaluation of him does not prove pretext." *Id.* (citation omitted).

In response to Defendant's meticulous documentation of a long-running list of infractions, Plaintiff alternatively disagrees that her conduct warranted punishment, or relies on unsupported assertions and speculation. Neither response is sufficient to avoid summary judgment.

For example, Plaintiff contends that she did not leave students unsupervised because "she was 'within eyesight' of her classroom whenever she had to step outside briefly and [] whenever she used the restroom another teacher would cover her classroom" by standing by her door and "watching both classrooms." (ECF 66 ¶ 20.) However, Defendant could find this was inconsistent with its instruction that Plaintiff "actively supervise her classroom, at all times." (ECF 62-1 at 26.) Similarly, Plaintiff contends that there was "nothing wrong" with her decision to leave school grounds during lunch (ECF 66 ¶ 32), but fails to address that she was reprimanded for failing to sign back in to school at least 47 times after leaving for lunch. (ECF 62-1 at 2.) Likewise, Plaintiff excuses her decision to allow students to answer the classroom phone in contravention of school

12

rules because "she did no more than any other teacher did," (ECF 66 ¶ 28), but fails to identify any other teacher who did so.

Plaintiff disputes facts that were not advanced by Defendant as a reason for Plaintiff's termination, such as whether or not she improperly used district equipment. (ECF 66 ¶¶ 33-35). She also claims that Defendant held other teachers to a more lenient standard, but fails to produce any evidence of other teachers' infractions or disciplinary proceedings beyond personal speculation. Plaintiff does provide testimony of Patricia Wright, a former Ridgway School District employee, that teachers younger than Plaintiff were not disciplined for similar infractions (ECF 66 ¶¶ 51-56), but Wright retired in 2011 and thus was not present during years that resulted in Plaintiff's termination. (ECF 65-11 at 8.) Plaintiff provides examples of other teachers who allegedly were not disciplined, but she fails to present evidence that these teachers were appropriate comparators in order to show that discrimination was the real reason for Plaintiff's suspension. For example, Plaintiff states that "A female teacher in her 40's was not disciplined even after receiving a DUI conviction." (ECF 66 ¶ 80.) Notwithstanding the fact that an off-campus DUI conviction is dissimilar to the teaching-related infractions Plaintiff was found to have committed, Defendant's display of leniency to another teacher over 40 years old tends to disprove, rather than prove, that Defendant was seeking to remove older teachers on the basis of age.

Defendant has catalogued a lengthy record of Plaintiff's professional deficiencies in contemporaneously recorded documents that were compiled over several years. Plaintiff has failed to produce contrary evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find [the employer's reasons] unworthy of credence." *Fuentes*, 32 F.3d at 765. Thus, Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

## V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendant's Motion for Summary Judgment.

Dated this 24th day of January, 2018.

Barbara Jacobs Rothstein
U.S. District Court Judge